## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

IN RE:

 FARO TECHNOLOGIES SECURITIES LITIGATION

                              Lead Case No. 6:05-cv-1810-Orl-22DAB

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

        This cause came on for consideration with oral argument on the following motions filed

herein:

| MOTION: | THE FARO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT (Doc. No. 57) |
|---|---|
| FILED: | July 31, 2006 |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED**, **in part**.

| MOTION: | DEFENDANT GRANT THORNTON LLP'S MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT (Doc. No. 59) |
|---|---|
| FILED: | July 31, 2006 |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED, in part.**

### INTRODUCTION

        This is a putative securities fraud class action seeking relief against FARO Technologies, Inc.

(herein "FARO" or "the Company") and individual corporate officers and directors of the Company

(Simon Raab, Gregory A. Fraser, and Barbara R. Smith – together with the Company, collectively known as the "FARO Defendants"), as well as the accountants retained by the Company (herein "Grant Thornton" or "GT"). This matter comes before this Court on motions by all Defendants to dismiss the Consolidated Class Action Complaint (herein "CAC") pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), and 15 U.S.C. § 78u-4(b). Defendants claim Lead Plaintiff[1] fails to plead with sufficient particularity the various securities fraud violations alleged. As more specifically set forth below, upon consideration of the allegations of the CAC (Doc. 45), the submissions of the parties,[2] and oral argument by counsel, the Court finds that Plaintiff has not sufficiently pled its claims as to all Defendants and accordingly recommends the motions to dismiss be granted in part and that Plaintiff be granted an opportunity to amend.

### THE ALLEGATIONS OF THE COMPLAINT

For purposes of the motions, the Court looks to the facts as alleged by Plaintiff in the CAC.

### The Parties

FARO is a Florida corporation that develops, manufactures, markets and supports computer-based manufacturing measurement and inspection equipment and related software (CAC at ¶ 24). When FARO was created in 1982, the Company initially focused on computerized 3-D measurement devices to be sold in the orthopedic and neurosurgical markets (CAC at ¶ 33). In 1992, the Company reincorporated in Florida and shifted its focus to the use of core measurement technology in the manufacturing and industrial markets (CAC at ¶ 33). By 1995, the Company began targeting

---

[1] This case has been pled as a class action, though it has yet to be certified as one. Accordingly, the Court refers to "Plaintiff" throughout this Report, as at present there is only the Lead Plaintiff, Kornitzer Capital Management, Inc.

[2] Plaintiff has filed a responsive brief (Doc. No. 65) and Grant Thornton has filed a Notice of Supplemental Authority (Doc. No. 66).

international markets and, within two years had established offices in France, Germany, and Great Britain (CAC at ¶ 33). By 2003, FARO expanded their international presence outside of Europe and established offices in China and the Asia/Pacific region (CAC at ¶ 38).

Defendant Raab, one of the company's co-founders, is the chairman of FARO's Board of Directors (CAC at ¶ 25). He served as FARO's President from 1986 to October 2004, served as CEO from 1982 until February 2006, and currently serves as Co-CEO. *Id.*

Defendant Fraser is the Company's other co-founder, and has served as a member of the Board of Directors, as well as the Company's Secretary and Treasurer, since 1982 (CAC at ¶ 26). He served as FARO's Chief Financial Officer until February 2005, and currently serves as Executive Vice-president. *Id.*

Defendant Smith served as the Company's CFO since her appointment in February 2005 (CAC at ¶ 27). She has since resigned from her position and is no longer with FARO, as the Company reported via July 26, 2006 press release (Doc. No. 65, page 1, fn. 1).

Grant Thornton is an accounting firm that audited the Company's financial results for the fiscal year ending December 31, 2004, as reported to the SEC on Form 10-K (CAC at ¶ 29). Plaintiff alleges that GT was first retained by FARO in August 2004 as a consultant. *Id.*

### *Overview of the Claims*

Plaintiff brings this securities fraud action on behalf of all purchasers of FARO securities between April 15, 2004 and March 15, 2006 ("the Class Period") (CAC at ¶ 1). Plaintiff alleges that during the Class Period, the FARO Defendants failed to disclose known information about the financial status of the company and at the same time issued false or misleading statements about the company's financial status, inventory levels, and internal controls in order to increase and maintain

the stock price (CAC at ¶ 3).  Plaintiff alleges that Defendant Raab and Fraser personally took advantage of the inflated stock price by cashing out over 1.7 million shares of FARO common stock and received "combined proceeds or other payments of 40 million dollars" while also acquiring another company, iQvolution AG, with, at least in part, shares of FARO common stock. (CAC at ¶ 6).

In addition to suing FARO and senior management, Plaintiff has sued GT, its independent auditor as of Nov. 15, 2004 (CAC at  ¶ 7).  GT first began performing services for FARO in connection with certain consulting that it was retained to perform following the discovery in the Summer 2004 (after the commencement of the Class Period) that the Company's Comptroller had embezzled over $100,000 from FARO over approximately a six month period of time (CAC at ¶ 7). Plaintiff alleges that despite GT's knowledge of inadequate internal controls and other red flags, it "turned a blind eye" to the deficiencies and opined to the adequacy of FARO's finances and internal controls rather than jeopardize a lucrative relationship (CAC at ¶ 7).

Plaintiff alleges that all Defendants knowingly or recklessly disregarded errors in FARO's methods of revenue recognition, and that, through their public misrepresentations about the Company's financial status and internal controls, Defendants fraudulently induced Plaintiffs to purchase or continue to hold FARO stock at artificially inflated prices in violation of Section 10(b) of the Exchange Act, 15 §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. § 240.10b-5.  The Complaint further alleges that the Individual Defendants are liable as "controlling persons" of FARO, under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

***The Alleged Fraud***

On April 15, 2004, the first day of the Class Period, FARO issued a press release pre-announcing FARO's first quarter financial results for the fiscal year 2004 [3] which stated in part:

> FARO Technologies, Inc. (Nasdaq: FARO) today reported sales of approximately $21 million for the fiscal first quarter ended April 3, 2004, a 56.7 increase from $13.4 million in the first quarter of 2003, and $1.0 million, or 5.0% above the high end of the Company's $19-20 million forecast for the quarter. Backlog at April 2, 2004 was approximately $5.6 million.   The Company reported new order bookings of approximately $19.1 million during the first quarter, an increase of $5.6 million, or 41.5% compared with approximately $13.5 million in the year-ago quarter.
>
> "Based on the 41.5% increase in new orders in the first quarter we are increasing our sales forecast for 2004 to $90-93 million, a 25%-30% increase over $71.8 million in 2003," said Simon Raab, FARO's President and CEO. "We intend to review our earnings guidance for 2004 in conjunction with our first quarter earnings release."

(CAC at ¶ 94).

 FARO continued to report strong financial performance throughout 2004 and into 2005.  In FARO's Form 10-Q 2Q FY 2004, FARO announced earnings growth of 142% over the prior year (CAC at ¶ 107); in its Form 10-Q 3Q FY 2004, FARO announced an increase in sales of almost 22% over the prior year's same quarter results and that sales in the Asia/Pacific region had grown at 66.7% (CAC at ¶ 116); in its Form 10-Q 4Q FY 2004, FARO announced an increase in sales of 23.9% of the previous year's same quarter results (CAC at ¶ 127); and its Form 10-Q 1Q FY 2005, wherein FARO announced a net income increase of 21.8% and a sales increase of almost 32% (CAC at ¶ 142).

The CAC asserts that following these reports of strong financial performance, FARO issued a series of corrective disclosures, which Plaintiff contends amount to admissions that the past reports were not accurate:

---

[3] For the remainder of this report, fiscal year will be abbreviated to "FY" so that the fiscal of year of 2004 would appear FY 2004.  When referring to quarterly results, abbreviation "Q FY" will be used so that the third quarter of the 2005 fiscal year will appear as 3Q FY 2005.

a)      On **November 3, 2005**, the Company issued a press release announcing FARO's financial results for the third quarter of fiscal year 2005 (CAC at ¶ 156). The November 3, 2005 press release reported record sales but also reported reduced gross margins and net income as a result of a write-off of $1.6 million in inventory, allegedly as a result of the Company's migration to a new enterprise resource planning system (which migration had taken place a year beforehand) and "issues" supposedly arising from that system migration.  On November 4, 2005, the share price of FARO common stock fell allegedly in response to the Company's announcement, with volume in excess of 4.4 million shares (CAC at ¶ 157). The price per share closed down at $17.99, $4.39 per share less than the previous day's closing price (a decline of 19%). Following the intervening weekend, on November 7, 2005, trading was again heavy, with over 1.4 million shares traded as the stock price again fell and closed at $16.50 per share. (CAC at  ¶ 157).  Plaintiff alleges that although FARO now disclosed that it was necessary to write-off $1.6 million in inventory, it nevertheless failed to disclose the true reasons that this write down was necessary -- the Company's senior management, including CEO Raab, deliberately had overvalued inventory in an effort to reduce the cost of goods sold and prop up reported gross margins, as well as profits and net income, in light of FARO's heavy (but undisclosed) discounting of product prices in order to meet its aggressive sales goals (CAC at ¶ ¶ 13; 160).

b)  On **January 19, 2006**, the CAC alleges that the Company issued a press release:

> pre-announcing FARO's financial results for the fourth quarter of fiscal year 2005. The January 19, 2006 press release again reported increased sales but also reported significantly reduced earnings, allegedly and principally because of, *inter alia*, higher than expected selling expenses in the form of commissions and bonuses. FARO and the other Defendants failed, however, to disclose that these selling expenses were far from unexpected and, in fact, the Company's senior management had systems in place to track sales and commissions payable on a daily basis throughout the Class Period, as well as an accounting system to report on commissions and bonuses payable in real-

time. In reality, notwithstanding FARO's representations, the commissions and bonuses payable to its sales force were a known natural consequence of the aggressive sales goals that the Company had established in 2005.  FARO simply chose to delay advising the market as to the adverse consequences of its heavy discounting upon gross margin and profits, and that the Company's salespeople were being compensated based upon meeting dollar based sales goals -- regardless of the discounts utilized to achieve such sales and/or the corresponding effect of discounting upon FARO's gross margins and overall profitability. (CAC at  ¶14 - paraphrased).

On January 20, 2006, following FARO's announcement, the price per share of FARO common stock lost $5.30 from the previous day's close and ended trading that day at $15.40 per share (a decline of 25%). Volume was heavy, with over 2.8 million shares exchanged. As the *Associated Press* reported that day, FARO's stock price hit a new 52-week low and traded at a "new low of $14.67, well below the prior trough of $16.42 per share, hit Nov. 7." (CAC at ¶ ¶ 15: 162).

c)      After the market had closed on **March 15, 2006**, FARO announced that it would not be filing its annual report with the SEC on time.  In a press release entitled, "FARO Technologies Reports Delayed Form 10-K Filing," the Company stated:

FARO Technologies, Inc. (NASDAQ:FARO) today announced that as a result of an internal review conducted by the Company, the Company recently learned of suspicious payments in connection with foreign sales activities in China. As a consequence, the Company is conducting an internal investigation to determine the extent of any improper payments and possible deficiencies in its books and records and internal controls with respect to operations in China and the Asia/Pacific region, in possible violation of the anti-bribery, books and records and internal controls provisions of the Foreign Corrupt Practices Act.

(CAC at ¶ 16).

FARO reported that, for the years ended December 31, 2005 and 2004, the Company's sales in China were approximately $9.0 and $4.2 million, respectively, or 7.1 percent and 4.3 percent of the Company's consolidated sales. (CAC at ¶169).   The Company noted that "in light of these developments, the Company believes that it is prudent at this time to withdraw its previous guidance

for its 2006 financial targets . . ." *Id.*   On March 16, 2006, in reaction to this news, the Company's stock price traded as low as $13.00 per share, before closing at $13.37 per share, a loss of $3.04 from the previous day's close (a decline of 18%). Volume was very heavy, with in excess of 2.6 million shares exchanged. (CAC at ¶ ¶ 17; 170). Plaintiff alleges that, as a result of this disclosure, the investing public "finally was placed on notice that FARO's representations regarding its sales in China and the Asia/Pacific region during 2004 and 2005, which were material to the Company's earnings throughout the Class Period, were false and misleading because they were the product of bribery or other unlawful misconduct in violation of the Foreign Corrupt Practices Act ("FCPA"). Furthermore, as a result of this disclosure, the investing public was finally placed on notice as to what Defendants knew all along -- that the Company's systems of internal controls were so woefully inadequate that, not only was the Company allegedly unable to keep track of its inventory or commissions earned by its sales personnel, and adequately plan production to meet sales requirements, thereby resulting in significant order backlogs, it was unable to determine whether the pace of its sales growth was the product of legitimate hard work or unlawful conduct and bribery." (CAC at ¶ 18).

Plaintiff asserts that throughout the entire Class Period, despite representations by FARO regarding the Company's increases in sales growth, reported profits, and FARO's alleged system of vigorous internal controls, they "knew that the Company's previously reported financials were false when issued and that the Company's internal controls were so woefully inadequate that they had no basis to believe that those numbers were true or false, or had been achieved through lawful or other means. More important to Defendants was that they had already received and utilized millions of

dollars in proceeds from their sales of their own FARO stock at artificially inflated prices."(CAC at ¶ 19).

With respect to Grant Thornton, the 2004 10-K was audited by GT, which reported on March 16, 2005, in its unqualified auditors' opinion that management's assessment that FARO Technologies, Inc. maintained effective internal control over financial reporting "as of December 31, 2004, is fairly stated, in all material respects. . . ." (CAC at ¶ 133). GT also reported that it had audited the consolidated balance sheet of FARO in accordance with the standards of the Public Company Accounting Oversight Board and expressed an unqualified opinion with respect to those financial statements (CAC at ¶ 133). Plaintiff alleges that this statement and certification with respect to FARO's systems of internal controls was false and misleading and GT knew or was severely reckless in failing to advise itself as to the falsity of that statement (CAC at ¶ 193).

## STANDARD OF REVIEW

On a motion to dismiss, this Court accepts as true all well-pleaded allegations of the Consolidated Class Action Complaint, and construes all reasonable inferences therein in the light most favorable to the plaintiff. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1198 n.2 (11th Cir. 2001) (*citing Byrant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). While the general rule mandates a court limit its inquiry to the four corners of the complaint when ruling on a motion to dismiss, an exception is granted in securities fraud cases to allow a court to take judicial notice (for the purposes of determining what statements the documents contain and not to prove the truth of the documents contents) of relevant public documents required to be filed with the Securities and Exchange Commission ("SEC"), and actually filed. *In re Sunterra Corp. Sec. Litig.*, 199 F.Supp.2d 1308, 1319 (M.D. Fla. 2002) (*quoting Bryant*, 187 F.3d at 1278).

Ordinarily, the standard provides that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In order to survive a motion to dismiss in a securities fraud case, however, a plaintiff must satisfy the requirements of Federal Rule of Civil Procedure 9(b), which requires that the circumstances constituting fraud be stated with particularity. *In re: Recoton Corp. Sec. Litig.*, 358 F.Supp.2d 1130, 1138 (M.D. Fla. 2005). A plaintiff satisfies Rule 9(b)'s particularity requirement for fraud when the complaint sets forth "(1) precisely what documents or oral representations were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Id.* (*quoting Ziemba*, 256 F.3d at 1202) (*itself quoting Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997)). "A sufficient level of factual support for a [10b] claim may be found where the circumstances of the fraud are pled in detail. 'This means the who, what, when where, and how: the first paragraph of any newspaper story.'" *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1262 (11th Cir. 2006) (internal citations omitted).

In addition to the particularity pleading requirements required of the plaintiff under Rule 9(b), the Private Securities Litigation Reform Act of 1995 (herein "PSLRA"), codified at 15 U.S.C. § 78u-4(b), further heightens the pleading burden by requiring that the complaint contain: (1) factual specificity as to the alleged misleading or omitted statements[4] and (2) particular facts raising a "strong

---

[4]Section 78u-4(b)(1) states: In any private action arising under this title in which the plaintiff alleges that the defendant - (A) made an untrue statement of a material fact; or (B) omitted to state a material fact in order to make the statements made, in light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which

inference" that a defendant acted with "the required state of mind."[5]  Failure to meet either of these

provisions mandates the dismissal of the Complaint on the motion by any defendant.[6]

With respect to the "required state of mind," this Court has noted that:

> The Eleventh Circuit has held that scienter is satisfied by a showing that the defendant
> had "an intent to deceive manipulate or defraud" or that the defendant "acted with a
> severely reckless state of mind." *Bryant*, 187 F.3d at 1282-83. Severe recklessness is
> " 'limited to those highly unreasonable omissions or misrepresentations that involve
> not merely simple or even inexcusable negligence, but an extreme departure from the
> standards of ordinary care, and that present a danger of misleading buyers or sellers
> which is either known to the defendant or so obvious that the defendant must have
> been aware of it.' " *Id.* at 1282 n. 18 (*quoting McDonald v. Alan Bush Brokerage Co.*,
> 863 F.2d 809, 814 (11th Cir. 1989)). While averments of motive and opportunity to
> commit fraud "may be relevant to a showing of severe recklessness . . . such
> allegations, without more, are not sufficient to demonstrate the requisite scienter." *Id.*
> at 1285. Further, the Eleventh Circuit has recently clarified that "scienter must be
> found with respect to each defendant and with respect to each alleged violation of the
> statute." *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004).

*In re Recoton,* 358 F.Supp.2d 1130 at 1139.

In addition to pleading fraud with particularity and scienter sufficiently, Plaintiff also has the

burden under the Exchange Act of showing that the misrepresentations alleged "caused the loss for

which plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).  As stated in *Recoton*:

> As explained by the Eleventh Circuit, "loss causation describes 'the link between the
> defendant's misconduct and the plaintiff's economic loss.' " *Robbins*, 116 F.3d at 1447
> (*quoting Rousseff v. E.F. Hutton Co.*, 843 F.2d 1326, 1329 n. 2 (11th Cir. 1988)). A
> plaintiff ultimately proves loss causation by showing "that the untruth was in some
> reasonably direct, or proximate, way responsible for his loss." *Id.* (citation and internal
> quotation omitted). Although a "plaintiff need not show that the defendant's act was
> the sole and exclusive cause of the injury," the plaintiff "must show that the

---

that belief is formed.

[5]Section 78(u-4(b)(2) states: In any private action arising under this chapter in which the plaintiff may recover
money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to
each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the
defendant acted with the required state of mind.

[6]The PSLRA mandates that "in any private action arising under this chapter, the court shall, on the motion of any
defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met."  15 U.S.C. § 78y-4(b)(3)(A).

misrepresentation touches upon the reason for the investment's decline in value." *Id.*
(internal quotations omitted). Allegations of artificial price inflation alone do not
satisfy the loss causation requirement. *Id.* at 1448.

358 F. Supp. 2d at 1152.

## *Legal Analysis*

Although the CAC is 153 pages long and contains 263 averments, it contains only two Counts.

Count I, for violation of Section 10(b) of the Exchange Act and Rule 10b-5, is against all Defendants

and incorporates by reference the entire preceding 248 averments (CAC at ¶ 249).  Count I alleges

that throughout the Class Period, Defendants "singly and in concert, directly or indirectly" engaged

in a common plan, scheme and course of conduct pursuant to which they "knowingly or recklessly

engaged in acts, transactions, practices and a course of conduct which operated as a fraud upon Lead

Plaintiff and the other members of the Class" made various false statements of material facts and

omitted material facts to make the statements not misleading, and "employed manipulative or

deceptive devices and contrivances" in connection with the purchase and sale of FARO common stock

and other securities (CAC at ¶ 250).  It is alleged that the Individual Defendants had actual knowledge

and intent to deceive or alternatively, acted with reckless disregard for the truth (CAC at ¶ 251).  All

Defendants are said to have acted with scienter, and as a result of the foregoing, the market price was

artificially inflated during the Class Period (CAC at ¶ 252-253).  Plaintiff avers that had it and the

other members of the Class known of the material adverse information which Defendants

misrepresented or failed to disclose, "they would not have purchased FARO securities at the

artificially inflated prices that they did" and were harmed as a direct and proximate result of the

alleged wrongful conduct.  (CAC at ¶ 254-256).

Compare these allegations with the allegations recently found wanting by the Eleventh Circuit

in *Wagner v. First Horizon Pharmaceutical Corporation,* 464 F.3d 1273 (11th Cir. 2006):

We illustrate this problem with Count IV of the complaint, which lays out the plaintiffs' claims for securities fraud against First Horizon and the individual defendants. The first paragraph, numbered 199, states, "Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein." R2-43 199. No further reference is made to the previous allegations in the complaint, leaving the reader to wonder which prior paragraphs support the elements of the fraud claim. Following this prior paragraph incorporation clause, the complaint generally avers a securities fraud claim.

In paragraph 200, the plaintiffs claim that the defendants carried out a plan to deceive the investing public, which resulted in the market trading the defendants' securities at an artificially high price. The next paragraph alleges that the defendants used untrue statements or omitted material statements that resulted in the fraud. The complaint then discusses the defendants' duty to truthfully report investing information to the public. The next two paragraphs summarize how the individual defendants are generally related to the allegations of fraud. The plaintiffs then allege that they traded during the class period, were unaware of the falsity of the defendants statements, and were injured by the fraud. These allegations cover, in a general manner, the elements of a securities fraud claim under Rule 10(b)-5, 17 C.F.R. § 240.10b-5. *See Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir.2001).

The central problem is that the factual particularity of the first 175 paragraphs is not connected to the otherwise generally pled claim in any meaningful way. [FN omitted] The concern we address today is structural and does not express an opinion on the merits of the claim. The lack of connection between the substantive count and the factual predicates is the central problem with each of the enumerated counts in the complaint, because courts cannot perform their gatekeeping function with regard to the averments of fraud. It is not that we know that the plaintiffs cannot state a claim but rather that we do not know whether they have. This is because the plaintiffs have not connected their facts to their claims in a manner sufficient to satisfy Rule 9(b).

464 F.3d at 1278.

Count II is equally general, incorporating by reference the preceding 257 averments of the CAC. (CAC at ¶ 258). This Count purports to state a violation of Section 20(a) of the Exchange Act, and asserts controlling person liability against Raab, Fraser and Smith.

Because of the CAC's style of presentation, it is difficult to parse through the allegations in order to *identify* the various claims, as opposed to averments that merely *support* the claims. For example, the CAC is replete with various allegations regarding business irregularities (violations of

Generally Accepted Accounting Principles – GAAP  and Generally Accepted Auditing Standards –

GAAS; insider trading; embezzlement by a former comptroller; as well as other mismanagement) and

the Court is unclear as to whether Plaintiff intends these averments to be merely evidence (of scienter,

perhaps) or each a stand-alone fraud.  As the CAC incorporates all of the allegations into each count,

consistent and thorough analysis is impossible.

### The FARO Defendants

As noted above, the CAC does not readily identify the alleged fraud; rather, Plaintiff asserts

a variety of statements, omissions and objectionable business practices that it lumps together in Count

I to sustain a cause of action for fraud against all Defendants.  The motions and Plaintiff's response

brief have grouped the alleged actionable false and misleading statements based upon the three

principal corrective disclosures issued by the Company, followed by a discussion of the main claim

of misrepresentation with respect to the lack of internal controls.

### The November 3, 2005 disclosure regarding the write off of $1.6 Million in inventory

As summarized above, Plaintiff argues that this disclosure brought to light two allegedly

material misrepresentations: 1) that FARO consistently overstated its gross margins by consciously

overstating the value of its inventory and understating its cost of goods sold, which boosted the

Company's gross margins, and 2) that Defendants consistently misrepresented the status of the

Company's internal controls.[7]  The FARO Defendants have asserted that this claim fails to meet the

heightened pleading standard under Rule 9 and PSLRA; is not a material misrepresentation as a matter

of law; and fails to adequately plead loss causation.

---

[7]Plaintiff asserts that the failure to have adequate controls prevented FARO from accurately calculating the true value of its inventory at any specific point in time, thereby preventing it from accurately reporting its costs, gross margins and profits, and also permitted FARO to conceal from the market the extent to which it was utilizing discounting to achieve desired sales.

**Heightened pleading requirement--**The Faro Defendants assert that Plaintiff does not satisfy the heightened requirements of pleading fraud with particularity in that Plaintiff presents nothing more than a "naked and conclusory assertion that FARO's undescribed subject inventory was obsolete or unsalable." (Doc. No. 57 at 16).   To the contrary, the inventory fraud claim is set forth with particularity in the CAC.  The CAC indicates that a confidential witness, a manager in the purchasing department, confirmed that FARO had over $1.1 million in obsolete inventory and the inventory is generally identified (packaging cases, defective read heads).  Another confidential witness is alleged to have attested to the significant "build up" of inventory levels (CAC at ¶¶ 60-62).  This is more than a "naked" allegation, and is sufficient to overcome this objection. *See Recoton, supra*.

**Materiality--**In the Rule 10b context, an omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (*quoting TSC Industries v. Northway, Inc.,* 426 U.S. 438, 449 (1976)). The FARO Defendants assert that the inventory claim is immaterial as a matter of law in that the $1.2 million of inventory at issue is equal to only approximately 1 percent of FARO's total reported assets during the Class Period.  The FARO Defendants argue that a reasonable investor would not have viewed that amount to be significant enough to be swayed by the alleged misrepresentation, citing *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539 (8th Cir. 1997) (alleged overstatement of assets was insignificant and not material where amount equaled only two percent of total assets, and investment was high-risk and high-yield opportunity); *Glassman v. Computervision Corp.,* 90 F.3d 617, 633 n. 26 (1st Cir. 1996) (nondisclosure of alleged nine percent decrease in backlog levels was immaterial) and *In re PetSmart, Inc. Securities Litigation,* 61 F.Supp.2d 982 (D. Ariz. 1999) (Ninth Circuit precedent recognizes that revenue shortfalls of 10% or less may be immaterial as a matter of law).

Materiality of an alleged misrepresentation is a factual determination that must be evaluated in the specific context in which the representation was made.  *In re Towne Services, Inc. Sec. Litig.,* 184 F.Supp.2d 1308 (N.D. Ga. 2001).  Here, the CAC alleges that the inventory misstatement was material, and had an impact on reported gross margins, as acknowledged by Raab (CAC at ¶¶ 158, 180 and 181).  Moreover, as addressed at hearing, Defendants' argument evaluates the written-off inventory as a percentage of *assets*; not as a percentage of all *inventory*.  While the amount may be 1% of assets, a write-off of 10-15% of all inventory is not *per se* immaterial, especially to the extent that it may indicate deeper problems within the Company.  Indeed, the CAC alleges that in the trading days immediately following the November 2005 announcement regarding writing off the inventory, the stock price fell over 20%.  Materiality of the alleged inventory misrepresentation has been adequately pled.

**Loss causation--**The FARO Defendants next contend that the inventory misrepresentation claim should be dismissed because Plaintiff has failed to properly plead loss causation.  In a federal securities fraud claim, the law requires:

> In any private action arising under this chapter, the plaintiff shall
> have the burden of proving that the act or omission of the defendant
> alleged to violate this chapter caused the loss for which the plaintiff seeks
> to recover damages. [15 U.S.C. § 78u-4(b)(4)].

A federal securities fraud claim is actionable "only where [] plaintiffs adequately allege and prove the traditional elements of causation and loss." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005).  The FARO Defendants cite to a recent opinion of Judge Whittemore, which sets forth the applicable standard:

> '[T]o establish loss causation, a plaintiff must allege that the subject of
> the fraudulent statement or omission was the cause of the actual loss
> suffered, i.e., that the misstatement or omission concealed something
> from the market that, when disclosed, negatively affected the value of

the security.' *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (internal quotations and citation omitted). . . .

In *Dura*, the U.S. Supreme Court held that loss causation may not be established by simply alleging a stock was purchased at an artificially inflated price. *Dura Pharms., Inc.*, 125 S.Ct. at 1631-32, 1634. Rather, to sufficiently plead loss causation, a plaintiff must allege a disclosure or revelation of truth about a defendant's prior misstatement or omission that is in some way connected with a stock price drop. *Id.* at 1634 (motion to dismiss granted based on plaintiffs' failure to plead loss causation where plaintiffs failed to allege that stock prices fell after 'the truth became known').

*In re Teco Energy, Inc. Securities Litigation,* 2006 WL 845161, *2 (M.D. Fla. March 30, 2006).

Here, the FARO Defendants contend that the CAC "does not allege that the alleged misstatement ever was "revealed" or "disclosed" to the market, or, that consequently, FARO's stock price dropped as a result of any such (non-existent) revelation of disclosure." (Doc. No. 57 at 19). At argument, these Defendants contended that there was never a corrective disclosure issued regarding obsolete inventory, in that the discrepancy noted was due to ERP system issues and not obsolescence. The Court, however, is concerned here not with what the Company says, but what the Complaint says. Although the Company contends that they never said that they were writing off inventory, the Complaint avers that the "November 3, 2005 press release reported record sales but also reported reduced gross margins and net income *as a result of a write-off of $1.6 million in inventory* . . ."(CAC at ¶ 11) (emphasis added). The CAC avers that the write-off was not due to ERP issues, as claimed, but was in fact due to the Company's senior management, including CEO Raab, deliberately overvaluing inventory in an effort to reduce the cost of goods sold and prop up reported gross margins, as well as profits and net income, in light of FARO's heavy (but undisclosed) discounting of product prices in order to meet its aggressive sales goals (*Id.* at ¶ 13). In a conference call on November 4, 2005, Raab allegedly discussed the "1.6 million cost adjustment to inventory"

and addressed analyst's questions regarding the effect of the adjustment, including an acknowledgment that the adjustment would affect gross margins (CAC at ¶ 158).   The CAC asserts that "on November 4, 2005, the share price of FARO common stock was pummeled in response to the Company's announcement." (CAC at ¶ ¶ 157, 12).

That said, the Court agrees with the FARO Defendants that loss causation is not adequately pled.   While the CAC, read as a whole, alleges that FARO was not truthful about its inventory problems, it is not apparent that the Complaint, fairly read, adequately avers that the stock lost value *due to FARO's misrepresentations* regarding the value of its inventory, rather than simply because of the very fact (and accurate disclosure) that the Company was adjusting its inventory numbers downward.   All businesses will eventually suffer major or minor setbacks, and such news regarding a company often leads to a drop in stock prices.   It does not necessarily follow, however, that every downward adjustment is the result of fraud.   There is no allegation here that the market "knew the truth" about why the inventory was being adjusted downward, at the time the market reacted to the write-down.[8]   That is, the facts alleged are perfectly consistent with another interpretation – the Company's gross margins were going to be worse than expected and that alone, *whatever the reason for it,* was enough to cause the decline.   As pled, this claim cannot be sustained.[9]   To the extent ambiguity exists in this shotgun pleading,  the Court **recommends** that the Court grant the motion to dismiss, with leave to amend in order to clarify this claim.[10]

---

[8]It may be that such an allegation is buried somewhere in the 263 averments; but it has not been pointed out to the Court either in briefing or at argument.

[9]Because of this finding, the Court need not address Defendants' arguments with respect to whether this claim was plead with sufficient scienter.  Suffice it to note that the CAC contains averments of *knowing* manipulation and misstatement of inventory levels.

[10]The Court notes that to sustain this claim at trial, Plaintiff will have the difficult burden of pleading and proving that the stock price fell as a result of the *misrepresentation* that the write-off was due to ERP migration problems, and not as a result of the accurate disclosure that 1.6 million dollars in inventory was being adjusted.  In other words, Plaintiff must

*The March 15, 2006 disclosure regarding suspicious payments in China*

The CAC alleges that FARO made payments in violation of the anti-bribery, books and records and internal controls provision of the Foreign Corrupt Practices Act ("FCPA").  According to Plaintiff,  FARO failed to disclose that certain revenues in China and the Asia/Pacific region were derived from bribes, and such revenue should not have been reported by the Company.

As indicated in their papers, all parties agree that FARO has since acknowledged that, in fact, improper payments were made (Doc. No. 65-2).  The Company, in a public filing, reported that it made referral fee payments (recorded as selling expenses) totaling $552,000, in connection with certain sales made during 2004 and 2005 (the sales in question totaled approximately $1.3 million and $3.24 million in 2004 and 2005, respectively).   As such, the payments were approximately 0.25 percent of FARO's total sales during 2004 and 2005 (Doc. No. 57, n. 8).

FARO contends that there is no authority stating that it cannot report actual (although illegal) sales, and that the amount in question is so small as to be immaterial as a matter of law.

The CAC sets forth that GT violated Generally Accepted Accounting Principles ("GAAP") in failing to report that these revenues were derived from bribes in violation of the FCPA (CAC at ¶¶ 182-187).  As for whether the omissions were material, the Company notes in public filing that it "anticipates incurring expenses of at least $3.5 million in 2006 relating to its internal investigation of the FCPA matter," that sanctions could well be imposed, and "[d]epending on how this matter is resolved, the Company's sales in China could be significantly impacted." (Doc. No. 65-2 at 9).  The Court finds that reasonable investors could consider this matter material.

---

plead that the stock lost value because FARO did not truthfully disclose *why* the inventory was adjusted; not because of the adjustment itself.

While the Court does not agree with the FARO Defendants' arguments that this claim is unsustainable as a matter of law, due to the awkwardness of the shotgun approach illustrated above, and as the Court recommends that a new complaint be filed to cure other deficiencies noted herein, Plaintiff should re-plead this claim in a more coherent fashion.

*The January 2006 disclosure regarding increased selling expenses*

At argument, the FARO Defendants contended that the January disclosure that the end of year bonus and incentives paid by the Company were higher than anticipated cannot be fraudulent in that the bonuses are not tallied until year end and are based on performance benchmarks, which the Company did not know would be exceeded.[11]   Plaintiff countered that the Company tracked commissions weekly and the increase in selling expenses was not unexpected.   The CAC confirms this allegation and further alleges a knowing delay in reporting to the market what the Company knew (CAC at ¶¶ 15-16).   To the extent the increased selling expenses disclosure contains a misrepresentation claim, the FARO Defendants have not raised sufficient grounds to dismiss it.

*The Lack of Internal Controls* and *Scienter*

As best this Court can tell, the main claim made by Plaintiff is that FARO had woefully inadequate internal controls, and that the FARO Defendants and GT knew about these inadequacies, and failed to inform the market and/or made affirmative misrepresentations regarding the adequacy of the controls.

At argument and in the papers, the FARO Defendants assert that Plaintiff has failed to plead scienter with respect to this claim, and that all of the other claims dependent on this claim are likewise

---

[11]The Court notes that this is not an argument that is properly presented on a motion to dismiss, as it goes to the merits of the claim, and not whether a claim has been adequately pled.

deficient.  According to Plaintiff, the following facts establish scienter, apparently with respect to all

of the claims:

- That Defendants, Raab and Fraser, engaged in a massive sell-off of stock when in the possession of material, adverse information regarding the Company's actual financial status and performance
- The inflated value of FARO stock was utilized as currency to fund the acquisition of iQvolution
- The CAC pleads multiple and serious GAAP and GAAS violations
- All Defendants executed Sarbanes-Oxley certifications that attested to the accuracy of the Company's financial statements and representations regarding their internal controls
- Defendant Raab expressly directed employees at FARO to carry obsolete inventory on the Company's books to avoid an increase in COGS and decreasing gross margins
- All of the individual Defendants regularly received reports and had access to reports from which they could discern the true financial status of FARO
- The ERP computer system purchased by FARO at the direction of Raab in July or August, 2004 still had not been successfully integrated by the Company as of August, 2005 and, during this period of time, FARO was effectively unable to track or calculate the value of inventory accurately or calculate the gross margins being reported by the Company and it was necessary for FARO to calculate gross margin manually as a result of these deficiencies
- It was necessary for FARO to call in outside consultants from Computer Associates in an effort to remedy problems with the Company's ERP system, and that effort was unsuccessful
- When GT implemented a system of internal controls to prevent future acts of embezzlement, it was necessary for FARO to adopt a rudimentary system because the Company's Finance Department was severely understaffed and its financial reporting systems were woefully inaccurate and could not accommodate a more sophisticated approach.

(Doc. No. 65 at 28-29).

As set forth above, in this circuit, scienter is satisfied by a showing that the defendant had "an

intent to deceive manipulate or defraud" or that the defendant "acted with a severely reckless state

of mind." *Bryant*, 187 F.3d at 1282-83.  Severe recklessness is " 'limited to those highly unreasonable

omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but

an extreme departure from the standards of ordinary care, and that present a danger of misleading

buyers or sellers which is either known to the defendant or so obvious that the defendant must have

been aware of it.' " *Id.* at 1282 n. 18 (*quoting McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989)); *see also Garfield, supra*.  While averments of motive and opportunity to commit fraud "may be relevant to a showing of severe recklessness . . . such allegations, without more, are not sufficient to demonstrate the requisite scienter." *Id.* at 1285-6.

Because the Court must find adequate allegations of scienter with respect to each defendant and with respect to each alleged violation of the statute,[12] the laundry list of horribles set forth by Plaintiff (without reference to how each horrible is connected to each claim) is not helpful.  Plaintiff has the burden of pleading its claims with particularity, and the structure of the CAC does not allow for the claim by claim, defendant by defendant analysis called for in the case law.  As such, Plaintiff must be made to re-plead.

Even if the Court were to take this list and apply it across the board, the Court cannot say that the list satisfies the scienter requirement with respect to all claims or Defendants.  The list, when viewed favorably, presents evidence of mismanagement, negligence, and questionable ( perhaps even unethical) behavior.  In order to plead scienter, however, Plaintiff must show a higher degree of inappropriate corporate conduct, and must allege it as to each Defendant.[13]  Such a showing is not apparent here.

It is respectfully recommended that the CAC be dismissed, without prejudice to reassert these claims against the FARO Defendants with greater clarity,[14] including the pleading of scienter as to each claim and defendant individually, in strict compliance with the controlling standards.

_____

[12] *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004).

[13]  Indeed, at argument, Plaintiff admitted that there was no "smoking gun" pled with respect to Defendants Fraser and Smith.

[14]In light of evolving case law interpreting the effect of Sarbanes-Oxley certifications, Plaintiff should take special care to be clear as to its contentions regarding the relationship between the certifications and the scienter requirement.

**Grant Thornton**

Plaintiff's allegations as to Grant Thornton's participation constitute over thirty paragraphs (CAC ¶¶ 7, 29, 159, 193-220) and over fifteen pages of the CAC.  Plaintiffs allege that Grant Thornton issued an audit opinion which accompanied FARO's 2004 10-K filing, either knowingly or in reckless disregard of the true conditions of FARO, thereby defrauding the public.

Specifically, Plaintiffs claim that GT's assessment of the effectiveness of FARO's internal controls was false and misleading when issued because FARO was able to "manipulate[] inventory levels to bolster the gross margins and net income reported and was reporting sales and net income based, in part, on sales and new orders obtained. . . in violation of the FCPA, which should not have been reported by [FARO] under any circumstance" and because "[FARO] and its senior management knew that FARO could not effectively track its inventory or calculate its gross margins. . . [due to deficiencies in FARO's internal controls]."  (CAC at ¶ 134).  Plaintiff insists that Grant Thornton's knowledge or reckless disregard of the fraud may be inferred from violations of GAAP and GAAS, coupled with various "red flags" which Plaintiff claims would have put a reasonable auditor on notice that a more thorough investigation was needed.

GT argues that the allegations against it amount to no more then conclusory allegations which fall short of the specificity and particularity requirements for pleading as required by the PSLRA.  It contends that the claim should be dismissed due to the failure to properly allege with particularity that it had the necessary scienter when it made the alleged material misrepresentation.

In the CAC, Plaintiff does not make any claim that GT actively participated in any fraud alleged to have been conducted by the FARO Defendants, nor is there any allegation that GT was "tipped off" to any of FARO's alleged wrongdoing.  Although Plaintiff cites to various "confidential witnesses," none of these witnesses aver that GT had actual knowledge of any fraud being perpetuated

by FARO.  The CAC does not allege that GT prepared the press releases at issue, nor are there allegations that GT ran the Company or participated in management decisions, sufficient to impute FARO's alleged wrongdoing to GT.[15]  The only statement allegedly attributable to GT is its assessment of FARO's internal controls included with FARO's 2004 10-K filing.  Plaintiff has plead, (and for purposes of this motion, the Court assumes) that this statement was false when made.

As already noted, the existence of scienter may be found by looking at the totality of the circumstances.  Scienter is not presumed, but must be established by sufficient allegations giving rise to the inference.  There is no bright line test, and the analysis is necessarily case specific.  This is especially so in the context of a claim against an auditor.  *See, for example*, *In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1328, 1344-47 (S.D. Fla. 1999) (finding that plaintiffs sufficiently pleaded fraud with particularity when they alleged that the accounting firm had been "tipped off" that Sunbeam had overstated its restructuring reserves and accounting firm ignored the information and issued its unqualified audit opinion); *Recoton*, 358 F.Supp.2d at 1147 (holding that even GAAP and GAAS violations and alleged "red flags" did not give to the required inference of scienter); *In re Sunterra*, 199 F.Supp.2d at1333 (holding that while GAAP and GAAS violations alone are not enough to establish a strong inference of scienter on the part of an independent auditor even if the auditor is grossly negligent in carrying out its responsibilities, violations of GAAS and GAAP standards combined with other "red flags" which the auditor chooses to ignore, could establish the required scienter).

---

[15] Although Plaintiffs do allege that GT performed a review of several Form 10-Q filings, Plaintiffs fail to attribute any statements of these filings to GT and thus have failed to properly plead reliance.  *See Ziemba*, 256 F.3d at 1205-06 (holding that allowing investors to attach primary liability to those who were never identified to investors as having played a role in a misrepresentation would permit Plaintiffs to avoid the reliance requirement for stating a claim under Rule 10b-5).

"Red flags" are "those facts which come to the attention of an auditor which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *In re Sunterra*, 199 F.Supp.2d at 1333.  However, these "red flags" must do more than merely rehash GAAP or GAAS violations or else they will not form a sufficient basis to survive a motion to dismiss. *Holmes v. Baker*, 166 F.Supp.2d 1362, 1379 (S.D. Fla. 2001).  Thus, absent any allegation that GT had actual knowledge of any alleged wrongdoing, the Court looks to whether Plaintiff has plead scienter through sufficient "red flags" or otherwise.

Plaintiff claims it has adequately alleged scienter based on violations of GAAP/GAAS, and the following alleged "red flags":

- GT's knowledge of prior embezzlement by FARO's comptroller

- GT's retention as a Section 404 advisor prior to becoming FARO's independent auditor and FARO's obsession with Section 404 review

- knowledge that GT was FARO's third auditor in four years

- timing of GT's placement as internal auditor

- knowledge of FARO's lack of internal controls due to under-staffing and inadequate ERP systems

- GT worked along side Ernst & Young prior to taking over Ernst & Young's duties as auditor and knew, or was severely reckless is not knowing, that Ernst & Young informed FARO that their internal controls were deficient

- knowledge that Defendants Raab and Fraser sold significant portions of their holdings in FARO stock in June of 2004

- knowledge that Xenon Research, Inc., an entity owned by Raab and his wife, sold a massive amount of FARO stock, unusual in timing and amount.

- •   knowledge that FARO acquired iQvolution AG primarily through stock, and thus had an incentive the inflate the Company's stock price, and

- •   GT's knowledge of Defendant Raab as a "micro-manager" of FARO

*Violations of GAAP/GAAS*

Plaintiff has alleged various violations of GAAP and GAAS, and the Court accepts those allegations as true, for present purposes.   Nonetheless, as acknowledged by Plaintiff in its brief, GAAP and GAAS violations alone are not enough to establish a strong inference of scienter on the part of the independent auditor even if the auditor is grossly negligent in carrying out its responsibilities.   *In re Sunterra*, 199 F.Supp.2d at 1333.   Thus, this Court focuses its attention to the sufficiency of the alleged red flags, in addition to the accounting violations, in determining whether or not GT was on notice that FARO was engaging in conduct detrimental to its shareholders.   *Id.* at 1334.

The first two alleged red flags (knowledge of prior embezzlement and retention as Section 404 advisor) are insufficiently connected to any alleged FARO wrongdoing and are therefore not persuasive evidence of scienter.  The alleged corporate wrongdoing is not embezzlement, and Plaintiff fails to show how knowledge of a former official's embezzlement should have put it on notice as to the FCPA violations in China or inventory shortfalls.  Although the prior embezzlement by FARO's comptroller did place GT on notice of past internal control problems, as pointed out by GT at argument, they were hired specifically to fix the problems which allowed the embezzlement to occur, and, in fact, the CAC alleges that they did just that by putting into place a system that would prevent future similar embezzlement (CAC at ¶ 70).   Indeed, the fact that it was retained to fix the problem belies an inference that GT should have known that the Company was participating in other wrongdoing.

FARO's "pre-occupation" with compliance with Section 404 is also unpersuasive as a "red flag" which would have put GT on notice as to all the internal controls problems. Section 404 made directors and officers personally liable for failure to comply with the requirements so there is nothing inherently suspicious in those same individuals responsible for compliance to be pre-occupied with the new requirement mandated by Congress. Indeed, an "obsession" with compliance is the very antithesis of a company allegedly trying to cover-up wrongdoing.

The next alleged red flag (knowledge that it was the third auditor in four years) is insufficient either by itself or in a collective set of red flags to establish scienter absent any knowledge by GT regarding the asserted "true" reason for the termination of the prior auditor. Although Plaintiff cites to a Form 8-K filed by FARO with the SEC announcing the dismissal of Ernst & Young, LLP as auditor and the retention of GT as the new auditor, Plaintiff fails to indicate how such a filing should have put GT on notice as to any alleged disagreement between Ernst & Young and FARO, regarding internal controls or any other matter. Indeed, the filing indicates that FARO dismissed Ernst & Young as its principal accountant to audit its financial statements, due to a desire "in the spirit of the Sarbanes-Oxley Act of 2002, to ensure a more clear separation between tax consulting and audit assistance"; noting that Ernst & Young was still being retained by FARO as its principal accountant for tax purposes (CAC at ¶ 122). Further, as alleged in the Complaint, Ernst & Young publicly stated that they have "*no basis to agree or disagree* [with FARO's decision on changing auditors]." (CAC at ¶ 122 (emphasis added)). Such a statement cannot, on its face, support a contention that Ernst & Young disagreed with FARO's decision to switch auditors or the stated reason it did so, let alone place a third party auditor on notice that the reason asserted was not the true reason for the

switch.  While it is true that GT was the third auditor in four years,[16] knowledge of this fact is not

enough to rise to the level of severe recklessness.  Absent any indication that GT knew that FARO

switched auditors for a reason other than the reason stated publicly, this knowledge, at best, raises

only a suspicion that something might be amiss.

The next red flag is allegedly that the timing of GT's placement as auditor, almost two months

before the Section 404 compliance was due, is evidence of, at least in part, scienter on the part of GT

to commit fraud.  In their CAC, Plaintiffs allege that such a time frame was insufficient for GT to

complete a full assessment of FARO's internal controls and as such, it should have been aware that

something was not right.  While the timing of the placement of an independent auditor may be

suspicious, if viewed charitably to Plaintiff, this allegation  was a mere warning sign, and does not

rise to the level of severe recklessness required.  *See In re Recoton*, 358 F.Supp.2d at 1147 (*citing*

*Nappier v. Pricehouse Coopers LLP*, 227 F.Supp.2d 263, 278 (D. N.J. 2002) (stating that red flags

"must be closer to smoking guns than mere warning signs") (internal quotations and citation omitted).

Plaintiff next asserts that GT's knowledge of the lack of internal controls, the under staffing

and inadequate ERP system should have been a red flag, and that GT should have known of internal

control issues through its contact with Ernst & Young.  However, as noted above, GT was hired

following the embezzlement by the FARO comptroller (the only absent internal control it is alleged

to have had actual knowledge of), and, according to the CAC, GT rectified that problem, albeit in an

alleged "rudimentary" fashion.  To the extent Plaintiff is attempting to charge GT with knowledge of

the inadequate internal controls regarding the inventory write-down, the write-down occurred in

August 2005, well after GT was hired and issued its March 2005 statement regarding the condition

---

[16]Deloitte & Touche served as FARO's auditor from 1997 - August 2000; Ernst & Young served as FARO's auditor from August 2000 - November 2004; and Grant Thorton has served has FARO's auditor from November 2004 - present.  (CAC at ¶ 201).

of the Company as of December 2004.  The CAC does not explain how GT can be charged with knowledge of what had yet to occur.  To the extent Plaintiff argues that GT should have known from its contact with the prior auditor, there is no allegation that Ernst & Young told GT of any such inventory difficulties, and, in fact, the prior auditor had noted no such difficulties in the most recent public filing.  As for the under staffing, Plaintiff fails to allege that GT had any say in the hiring of staff with FARO's own Finance Department or that analysis of such under staffing was within GT's duties as auditor.[17]  Similarly, Plaintiff contends that the new ERP system was deficient when implemented and therefore should have put GT on notice that a closer investigation was needed. Absent from the allegations, however, is a claim that GT knew of the system deficiencies, including where the deficiencies were, and then failed to investigate further.  At argument (and in the CAC), Plaintiff noted that the new ERP system was installed in November 2004, but not fully implemented until August 2005 (*See* CAC at ¶¶ 82-85; 199).  The opinion issued by GT was for December 2004. The CAC does not allege that as of one month after installation, GT could have known that the ERP system would prove to be inadequate and unfixable.[18]   These allegations, even if fully credited, aggregated and combined with GAAP/GAAS violations, illustrate, at best, no more than negligence in issuing the unqualified audit opinion.

Plaintiff next alleges that the transactions by Defendant Raab and Fraser should have put GT on notice as to alleged wrongdoing and therefore warranted closer scrutiny of accounting records, as

---

[17]While it can be argued that a staffing analysis was within the duties of GT as a consultant with respect to the post-embezzlement scope of work, there is no allegation that understaffing was connected to the failure to prevent the embezzlement and, in any event, the CAC alleges that GT fixed the problem which allowed the embezzlement to occur.

[18]At argument and in the papers, Plaintiff acknowledges that GT's "awareness of these deficiencies necessarily increased over the span of the Class Period" (Doc. No. 65 at 47), and contends that GT had a duty to update their opinion, once they learned that there certification was false.  This is not a suit for accountant malpractice, however.  GT is not being sued for failing to update a certification; it is being sued for securities fraud, and the only alleged fraud is the December 2004 audit statement.  Thus, at issue is whether the statement was knowingly (with scienter) false *when made*.

-29-

the FARO Defendants would have had a motive to sustain artificially inflated stock prices.  While the Court accepts the allegations of insider trading as true and, for the purposes of these motions, also accepts the proposition that the FARO Defendants[19] would  have a motive to inflate the stock price, Plaintiff fails to explain how this information would have placed GT on notice that internal controls were deficient or that sales in the Pacific Rim were the product of bribes, or even that GT should take a closer look at the financials, in general.  The insider trading occurred prior to GT's arrival and was publicly disclosed.[20]  Thus, the market already knew what GT learned after its retention regarding the trading.  Indeed, it could be argued that any motive for artificially increasing the sales price dissipated following the successful sale.  As for the Xenon sale, this too was disclosed publicly and occurred *after* the allegedly fraudulent unqualified audit opinion was issued by GT.  While the sell-off was certainly not insignificant, the timing of the sell-off is not connected in any reasonable way to the alleged auditor misrepresentation, and the public nature of the information may have made it a red flag for investors, but not necessarily for auditors. As Plaintiff fails to state why a sell-off of corporate holdings, properly disclosed, should have pointed GT's attention towards a review of FARO's internal controls, these two alleged "flags" are not sufficient evidence of scienter.

The same analysis applies with respect to the next alleged red flag – the acquisition of iQvolution funded primarily by FARO stock.  Plaintiff fails to draw a connection between corporate holdings and any alleged fraud.  Although Plaintiff contends that the acquisition is proof that FARO had incentive to boost the value of the stock, the same can be said for every successful corporate

[19]Note that Defendant Smith is not accused of any such insider trading and thus, this shotgun allegation cannot serve to imply motive to her.

[20]Plaintiffs allege Defendant Raab sold stock three times (May 12, 2004; May 13, 2004; and May 14, 2004) and Defendant Fraser sold stock two times (May 12, 2004 and May 13, 2004)  prior to the arrival of Grant Thornton.  Plaintiff further alleges that Defendant Raab caused the sell-off of a massive amount of FARO stock through Raab and his wife's jointly owned company Xenon Research, Inc. on May 12, 2005, over five months after GT issued its unqualified audit opinion.

officer, and mere motive does not equal an inference of fraud. Certainly, even if GT could be charged with knowledge that the FARO Defendants had every reason to overstate the value of the stock, Plaintiff still fails to explain how such knowledge would have led GT to discover the inventory issues, the FCPA violations or the inadequate internal control issues.

The final red flag – knowledge that Raab dominated the Company – is too vague to amount to scienter. Assuming the truth of the assertion, absent any connection between the alleged micro-management and the alleged fraud, knowledge of Raab's corporate dominance is insufficient to put GT on notice of any specific wrongdoing.[21]

Viewed individually and collectively, Plaintiff asserts no more than a collection of circumstances which, viewed in hindsight, might be sufficient to substantiate negligence on the part of the auditor. Plaintiff has not, however, pled sufficient circumstances to meet the high bar set for auditor fraud in this circuit. In addition to failing to set forth facts from which severe recklessness can be inferred, Plaintiff fails to allege a proper motive on the part of GT to commit fraud against the Plaintiff. Plaintiff does not allege any stock ownership by GT in the Company, nor any other benefit which would flow to GT as a result of returning a favorable audit opinion. Although Plaintiff claims that GT looked away from obvious deficiencies in order to preserve a "lucrative ongoing relationship," this motive can be affixed to any auditor of any company. In view of the Sarbanes-Oxley Act and the real world consequences that result should firms stray from their trusted position as independent auditor, desire to keep a particular client is no longer sufficient motivation when the continued existence of the firm itself would be at risk.

---

[21]The Court notes the inconsistency between the allegation that Raab micro-managed every aspect of the Company and the fact that the Comptroller was able to commit embezzlement for a period of time without discovery.

Here, Plaintiff fails to allege a conflict of interest which would compromise the auditor's independence.  Such a conflict will exist as a result of a "special financial relationship" between an auditor and their client which creates financial incentives to the auditor based on their clients success. *In re Sunterra*, 1999 F.Supp.2d at 1337.  Clearly, the wish to retain a client cannot be a "special financial relationship" as it is the wish of all auditors, and indeed all businesses to keep their client base.

As the District Court in California noted:

First, a large independent accountant will rarely, if ever, have any rational economic incentive to participate in its client's fraud. Unlike the officers and directors of the companies it represents, an independent accountant has no ability to line its pockets through insider trading, and no incentive to cover up corporate mismanagement. The accountant's success depends on maintaining a reputation for honesty and integrity, requiring a plaintiff to overcome the irrational inference that the accountant would risk its professional reputation to participate in the fraud of a single client. Second, because an independent accountant often depends on its client to provide the information base for the audit, it is almost always more difficult to establish scienter on the part of the accountant than on the part of its client.  Finally, the report generated by an independent accountant often represents a "professional opinion based on numerous and complex factors."

*Reiger v. Price Waterhouse Coopers, L.L.C.*, 117 F.Supp.2d 1003, 1007-08 (S.D. Cal. 2000) (*internal citations omitted*).

As noted above, in this circuit, it is not enough to establish that an auditor merely erred or was negligent in failing to discover information; rather, in order to plead a securities fraud claim, Plaintiff must offer specific factual allegations that are sufficient to support the "strong inference that the audit was so deficient that it amounted to no audit at all." *Sunterra,* 199 F. Supp. 2d at 1337. Viewing the allegations of this Complaint in the favorable light due Plaintiff, it cannot be said that Plaintiff has met this exacting standard.  As such, the claim, as pled, cannot survive the motion to dismiss.

### CONCLUSION AND RECOMMENDATION

Due to the numerous deficiencies set forth above, it is **recommended** that the FARO Defendants' motion to dismiss be **granted, in part,** and the CAC be **dismissed**, with leave to re-plead setting forth each count in a fashion sufficient to establish each claim (along with the facts supporting each claim) against each of these defendants.  With respect to the claim against the auditor, it is **recommended** that the motion to dismiss be **granted, in part.**  Although GT seeks dismissal with prejudice, such a dismissal is premature at this point.  As the CAC is pled in shotgun fashion, the Court cannot be certain that it has reviewed all allegations that were meant to pertain to the claim against the auditor.  Although the Court finds that Plaintiff has failed to plead a sufficient claim against GT, Plaintiff should be allowed another opportunity to assert, if it can, in *specific* fashion, its claim against the auditor, bearing in mind the above findings.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on January 12, 2007.

*David A. Baker*
_____
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy