# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

IN RE:

 FARO TECHNOLOGIES SECURITIES LITIGATION

**Lead Case No. 6:05-cv-1810-Orl-22DAB**

_____

# REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the following motions filed

herein:

| | |
|---|---|
| **MOTION:** | **FARO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT (Doc. No. 83)** |
| **FILED:** | **May 11, 2007** |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

| | |
|---|---|
| **MOTION:** | **GRANT THORNTON'S MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT (Doc. No. 85)** |
| **FILED:** | **May 11, 2007** |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

## BACKGROUND

This is a putative class action alleging securities fraud against FARO Technologies, Inc.

(herein "FARO" or "the Company") and individual corporate officers and directors of the Company

(Simon Raab, Gregory A. Fraser, and Barbara R. Smith) (herein "the Individual Defendants" – together with the Company, collectively known as the "FARO Defendants"), as well as the accountants retained by the Company (herein "Grant Thornton" or "GT").  The background of the litigation is set forth in detail in the undersigned's prior Report and Recommendation recommending dismissal of the Consolidated Amended Complaint (Doc. No. 70, adopted by this Court at Doc. No. 71).  Subsequent to the dismissal, Lead Plaintiff filed the Consolidated Second Amended Complaint (Doc. No. 72), and the instant motions, along with Plaintiff's response brief (Doc. No. 90), followed.  The parties have filed additional briefing (Doc. Nos. 95-97) at the Court's request, with respect to the United States Supreme Court's recent ruling in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, __ U.S. __,127 S.Ct. 2499, 2007 WL 1773208 (June 21, 2007) (slip opinion).  The matter is now ripe for review.

### SUMMARY OF THE SECOND AMENDED COMPLAINT

As with the prior complaint, Plaintiff brings this securities fraud action on behalf of all purchasers of FARO securities between April 15, 2004 and March 15, 2006 ("the Class Period"), alleging that during the Class Period, the FARO Defendants failed to disclose known information about the financial status of the company and at the same time issued false or misleading statements about the company's financial status, inventory levels, and internal controls in order to artificially increase and maintain the stock price.  Plaintiff alleges that Defendant Raab and Fraser personally took advantage of the inflated stock price by cashing out over 1.7 million shares of FARO common stock and received "combined proceeds or other payments of 40 million dollars" while also acquiring another company, iQvolution AG, with, at least in part, shares of FARO common stock.

In addition to suing FARO and senior management, Plaintiff has sued GT, its independent

auditor as of Nov. 15, 2004, alleging that despite GT's knowledge of inadequate internal controls and other red flags, it deliberately ignored the significant deficiencies and opined to the adequacy of FARO's finances and internal controls.

Plaintiff alleges that all Defendants knowingly or recklessly disregarded errors in FARO's methods of revenue recognition, and that, through their public misrepresentations about the Company's financial status and internal controls, Defendants fraudulently induced Plaintiffs to purchase or continue to hold FARO stock at artificially inflated prices in violation of Section 10(b) of the Exchange Act, 15 §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. § 240.10b-5. The complaint further alleges that the Individual Defendants are liable as "controlling persons" of FARO, under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## LEGAL STANDARDS

On a motion to dismiss, this Court accepts as true all well-pleaded allegations of the Second Consolidated Class Action Complaint, and construes all reasonable inferences therein in the light most favorable to the plaintiff. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1198 n.2 (11th Cir. 2001) (citing *Byrant v. Avado Brands, Inc*., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). While the general rule mandates a court limit its inquiry to the four corners of the complaint when ruling on a motion to dismiss, an exception is granted in securities fraud cases to allow a court to take judicial notice (for the purposes of determining what statements the documents contain and not to prove the truth of the documents contents) of relevant public documents required to be filed with the Securities and Exchange Commission ("SEC"), and actually filed. *In re Sunterra Corp. Sec. Litig*., 199 F.Supp.2d 1308, 1319 (M.D. Fla. 2002) (quoting *Bryant*, 187 F.3d at 1278).

Previously, the general standard provided that a complaint should not be dismissed for failure to state a claim unless it appeared beyond doubt that plaintiff could prove no set of facts that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Recently, however, the Supreme Court has adopted a somewhat heightened standard requiring a plaintiff to supply more than just any conceivable set of facts tending to support a claim, but "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, __ U.S. __, 127 S.Ct. 1955, 1973, 2007 WL 1461066 (2007).  *See also Erickson v. Pardus,* 551 U.S. ___ (2007), where the Court confirmed that "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" (Slip op. at 5.)  In order to survive a motion to dismiss in a securities fraud case, a plaintiff must also satisfy the requirements of Federal Rule of Civil Procedure 9(b), which requires that the circumstances constituting fraud be stated with particularity. *In re: Recoton Corp. Sec. Litig*., 358 F.Supp.2d 1130, 1138 (M.D. Fla. 2005).  A plaintiff satisfies Rule 9(b)'s particularity requirement for fraud when the complaint sets forth "(1) precisely what documents or oral representations were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Id.* (quoting *Ziemba,* 256 F.3d at 1202) (itself quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc*., 116 F.3d 1364, 1371 (11th Cir. 1997)). "A sufficient level of factual support for a [10b] claim may be found where the circumstances of the fraud are pled in detail. 'This means the who, what, when where, and how: the first paragraph of any newspaper story.'" *Garfield v. NDC Health Corp*., 466 F.3d 1255, 1262 (11th Cir. 2006) (internal citations omitted).

In addition to the particularity pleading requirements required of the plaintiff under Rule 9(b),

the Private Securities Litigation Reform Act of 1995 (herein "PSLRA"), codified at 15 U.S.C. § 78u-4(b), further heightens the pleading burden by requiring that the complaint contain: (1) factual specificity as to the alleged misleading or omitted statements[1] and (2) particular facts raising a "strong inference" that a defendant acted with "the required state of mind."[2]  Failure to meet either of these provisions mandates the dismissal of the complaint on the motion by any defendant.[3]

> With respect to the "required state of mind," this Court has noted that:
>
> The Eleventh Circuit has held that scienter is satisfied by a showing that the defendant had "an intent to deceive manipulate or defraud" or that the defendant "acted with a severely reckless state of mind." *Bryant*, 187 F.3d at 1282-83. Severe recklessness is " 'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it.' " *Id.* at 1282 n. 18 (quoting *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989)). While averments of motive and opportunity to commit fraud "may be relevant to a showing of severe recklessness . . . such allegations, without more, are not sufficient to demonstrate the requisite scienter." *Id.* at 1285. Further, the Eleventh Circuit has recently clarified that "scienter must be found with respect to each defendant and with respect to each alleged violation of the statute." *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004).

*In re Recoton*, 358 F.Supp.2d 1130 at 1139.

---

[1]Section 78u-4(b)(1) states: In any private action arising under this title in which the plaintiff alleges that the defendant - (A) made an untrue statement of a material fact; or (B) omitted to state a material fact in order to make the statements made, in light of the circumstances in which they were made, not misleading; the complaint shall specify each statement to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

[2]Section 78(u-4(b)(2) states: In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

[3]The PSLRA mandates that "in any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met." 15 U.S.C. § 78y-4(b)(3)(A).

The United States Supreme Court has just clarified the task of the court in evaluating an allegation of scienter.  In *Tellabs, Inc., supra*, the Court held that as "[t]he strength of an inference cannot be decided in a vacuum" but is "inherently comparative," a court must engage in a comparative evaluation in determining whether a strong inference of scienter has been pled.  127 S.Ct. at 2510.  A "strong inference" is one that is "cogent and compelling, thus strong in light of other explanations." *Id.*  District courts are directed to weigh the alleged inferences through a three-step process: 1) accepting all factual allegations as true; 2) "holistically" evaluating the complaint in its entirety to determine whether *all* of the facts give rise to a strong inference of scienter, and 3) taking into account plausible opposing inferences of non-fraudulent intent.  *Id.* at 2511.  A complaint will survive only if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 2503.

In addition to pleading fraud with particularity and scienter sufficiently, Plaintiff also has the burden under the Exchange Act of showing that the misrepresentations alleged "caused the loss for which plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). As stated in *Recoton:*

> As explained by the Eleventh Circuit, "loss causation describes 'the link between the defendant's misconduct and the plaintiff's economic loss.' " *Robbins,* 116 F.3d at 1447 (quoting *Rousseff v. E.F. Hutton Co.*, 843 F.2d 1326, 1329 n. 2 (11th Cir. 1988)). A plaintiff ultimately proves loss causation by showing "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *Id.* (citation and internal quotation omitted). Although a "plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury," the plaintiff "must show that the misrepresentation touches upon the reason for the investment's decline in value." *Id.* (internal quotations omitted). Allegations of artificial price inflation alone do not satisfy the loss causation requirement. *Id.* at 1448.

358 F. Supp. 2d at 1152.

*ISSUES AND ANALYSIS*

**The Claims as to the FARO Defendants**

The motion asserts that the Second Amended Complaint ("SAC") fails to state a cause of action in that it is a shotgun pleading that lacks specificity, the claims fail to adequately allege loss causation, and the claims fail to allege scienter.   After a careful review in accordance with the standards set forth above, the Court is not persuaded and **respectfully recommends** that the motion of the FARO Defendants be **denied.**

### Shotgun Pleading

In prior Report, this Court found that the lumping of all the allegations in "shotgun" style and incorporating same into the two counts made it impossible to evaluate the complaint, claim by claim and defendant by defendant.   Both the FARO Defendants and GT claim that this complaint fares no better.   While the Court does not go so far as Plaintiff in finding the SAC to be a "highly detailed, well organized and extraordinarily cogent pleading" and declines Plaintiff's invitation to declare it "a model of how actionable securities fraud should be pled" (Doc. No. 90 at 2, n.3), the pleading nonetheless satisfies the "who, what, when, where and how" standard, in acceptable fashion.

The SAC does not add new claims, but rather clarifies the existing claims, in accordance with the Court's prior rulings.[4]   As summarized in Allegation 48 of the SAC, Lead Plaintiff asserts that FARO "deliberately overstated its profits and hid the true nature of its financial condition" by:

> 1. inflating gross margins by consciously overstating the value of its inventory and thereby understating its cost of goods sold ("COGS") (herein "the inventory claim");

---

[4]The prior Report and Recommendation set forth the claims in great detail, not repeated here.

2.  concealing the fact that gross margins and profits were overstated because FARO was failing to report the true amount of commissions (herein "the selling expenses claim");

3.  overstating the amount of sales by including sales achieved through unlawful conduct in Asia in violation of the Foreign Corrupt Practices Act (herein "the FCPA claim"); and

4. failing to disclose the serious deficiencies in and inadequacy of FARO's internal control systems (herein "internal controls claim").

**_Inventory Claim_**

The FARO Defendants assert that Plaintiff has failed to plead loss causation with respect to this claim, citing the Court's previous Report.  In that Report, the Court noted:

> While the CAC, read as a whole, alleges that FARO was not truthful about its inventory problems, it is not apparent that the Complaint, fairly read, adequately avers that the stock lost value due to FARO's misrepresentations regarding the value of its inventory, rather than simply because of the very fact (and accurate disclosure) that the Company was adjusting its inventory numbers downward. All businesses will eventually suffer major or minor setbacks, and such news regarding a company often leads to a drop in stock prices. It does not necessarily follow, however, that every downward adjustment is the result of fraud. *There is no allegation here that the market "knew the truth" about why the inventory was being adjusted downward, at the time the market reacted to the write-down.*[footnote omitted] (emphasis added).

(Doc. No. 70 at 18).  By contrast, however, the SAC contains the missing allegations that the market "knew and understood that the Company's previous representations regarding the value of its inventory, gross margins and profitability during the Class Period had been untruthful" (SAC at ¶ 179); and that it was that representation, once disclosed, that led to the decline of the stock price. *See* ¶¶ 5, 6, 50, 178, 180, 237 and 238.  While Defendants contend that Plaintiff has not plead *facts*

to support this conclusion, and that the allegations plead, at best, skepticism as to the true reason for the write-down, the Court does not take so narrow a view.  The SAC alleges:

On November 3, 2005, FARO was...forced to reveal that its prior Class Period statements regarding the value of its inventory, its gross margins and its profits had been false and misleading because its inventory had been overvalued by between $1.6 and $2.1 million . . .  SAC at ¶5;

[I]n response to the November 3, 2005 partial disclosure, on November 4, 2005, the Company's common stock price was pummeled and fell nineteen percent (19%) and then fell more than an additional six percent (6%) on the next day of trading.  ¶6;

FARO's stock price was punished by this disclosure because the market and investing public now knew the truth regarding the prior misrepresentations with respect to COGS (e.g., cost of goods sold) and gross margins . . .  ¶50;

FARO's stock price specifically fell because the market knew and understood that the Company's previous representations regarding the value of its inventory, gross margins and profitability during the Class Period had been untruthful.... The market specifically questioned the legitimacy of FARO's ERP [enterprise resource planning] system migration for this inventory revaluation and, in any event, clearly understood that the Company's November 3, 2005 announcement disclosed previous misstatements in the value of the inventory by FARO.  For example, as one investor wrote on . . . November 3, 2005 . .., 'the problem is in Cost of Sales,' and 'as an ex-auditor' it wouldn't be the first time I've encountered prior overstatements of inventory being 'corrected' under the smokescreen of implementing new systems" ¶179;

Raab acknowledged in a conference call with analysts and investors that prior period gross margins were overstated,  ¶180;

[A]s a direct result of corrective disclosures which revealed the untruthful nature of Defendants' prior representations, including FARO's prior overstatements of the value of its inventory, ... the price of FARO stock fell precipitously because the material nature of Defendants' false and misleading statements became apparent. ¶237;

[W]hen the truth about Defendants' misrepresentations during the Class Period was revealed, the Company's stock price plummeted and the artificial inflation came out of the stocks, thereby damaging Lead Plaintiff and the Class.  ¶238;

> The timing and magnitude of FARO's stock price changes in response to the corrective disclosure ... on November 3, 2005 ... negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or company-specific facts unrelated to Defendants' fraudulent conduct and the revelations specifically connected to that fraudulent conduct contained in the corrective disclosures.   ¶ 239.

As such, the SAC has adequately alleged "a connection between the stock price drop and the disclosure of the 'truth' about a defendant's previous misstatement or omission" with respect to the inventory claim. *In re TECO Energy, Inc. Securities Litigation,* 2006 WL 845161 at 2 (M.D. Fla. 2006).

FARO Defendants next assert that the SAC fails to plead scienter as to Defendants Fraser and Smith.  While conceding that the SAC alleges scienter with respect to FARO and Raab by asserting direct knowledge of the obsolete inventory, Defendants nonetheless assert that "there are no allegations that Fraser or Smith knew, or were severely reckless in not knowing, of this supposed inventory." (Doc. No. 83 at 15).  As pointed out by Plaintiff, however, the SAC does contain allegations that these Defendants were specifically aware of severe problems in FARO's inventory control systems,[5] and were responsible for assurance of adequate internal controls (*see* ¶¶ 224-236, 246, and 254-257).  Viewing the SAC "holistically" as required by *Tellabs,* and absent any countervailing inference offered by these Defendants, the Court finds that Plaintiff has adequately pled a cogent inference that these two corporate officers either knew or were severely reckless in not knowing of the obsolete inventory.

The Court finds that the inventory claim has been adequately stated against the FARO Defendants.

---

[5]The materiality of the inventory issue is not contested.  This was not a *de minimis* amount of obsolete inventory.

*The Selling Expenses Claim*

Plaintiff alleges that the FARO Defendants deliberately misstated selling expenses during 2005, which materially overstated the Company's profits, until the corrective disclosure on January 19, 2006.  FARO Defendants contend that this claim has not been plead with specificity, does not establish loss causation, and lacks sufficient scienter allegations.

While acknowledging that the SAC contains repeated allegations that FARO "somehow misrepresented the amount of its selling expenses for the first, second, and third quarters of 2005" Defendants argue that the claim fails in that Plaintiff never alleges any amount by which the selling expenses were understated.  The Court rejects this argument, to the extent it purports to hold that a plaintiff may not sue for misrepresentation absent allegations that quantify the falsity to the penny.  As noted by Defendants, allegations of misstatements in financial statements must show the manner in which the misrepresentation misled the plaintiff.  While an accurate accounting would no doubt be ideal, such is simply not required (and often simply not available) at the pleading stage.

With respect to loss causation and the specificity objections, as Plaintiff notes in its brief, the SAC alleges:

> [O]n January 19, 2006, FARO was ... forced to reveal that its 2005 Class Period statements regarding the selling expenses it had accrued and expected to incur were false and misleading because these expenses were materially higher ($2.5 million) than previously reported and/or anticipated and that its prior Class Period statements regarding its alleged systems of internal controls had been false and misleading because such under-reporting and failure to properly accrue for and anticipate routine selling expenses had been permitted to occur  SAC at ¶ 5;

> FARO hired numerous new sales representatives to drive sales and that the Company expanded its Marketing Department by hiring a new classification of employee ("Regional Marketing Coordinators" or "Marketing Coordinators") in 2005 ¶ 66;

-11-

CW14[6] stated that a significant portion of the $2.5 million in higher headcount, bonuses, commissions and marketing costs disclosed by FARO in January, 2006 was attributable to the cost of the Regional Marketing Coordinators hired by Raab ¶70;

CW16 ... attributed most of the additional selling expenses disclosed in January, 2006 to the fact that the headcount in FARO's Marketing Department more than doubled in 2005 and commissions grew since the number of exhibitions/trade shows in which FARO participated "tripled" in number -- a fact that similarly could not have led to selling expenses that were unanticipated ¶ 71;

CW13 ... explained that FARO did not pay bonuses to any of its sales or marketing people and that FARO carefully tracked the commissions due to its employees, thereby confirming that the Company's explanation of its high 2005 selling expenses, based upon unexpectedly large bonuses, also was untrue ¶ 72;

CW15 ... confirmed that FARO did not pay bonuses to its marketing and sales force but, rather, these employees were simply paid commissions that were easily predictable. CW15 explained that only employees who were not involved in marketing or sales were eligible for bonuses up to certain percentages of their salaries...  ¶ 73;

According to CW14, FARO utilized a program, named Goldmine, to carefully track and accrue commissions due and payable to its marketing and sales personnel on a daily, weekly and monthly basis so that commissions and other remuneration payable, as well as headcount expenses, could not be unexpected. CW13 corroborated that the Company utilized Goldmine to track commissions due to its sales and marketing employees. ¶ 74;

CW14 stated that, since commissions were tracked on a daily and monthly basis and no bonuses were paid to either sales and marketing employees, the additional headcount, bonus, commission and marketing costs could not have been unexpected. CW14 also related that his/her supervisor, Shaun Mymudes, FARO's Director of Product Management and North American Marketing from 1994 until April, 2006, would send each Marketing Coordinator a monthly statement of commissions for review before it was sent to payroll and that the Company was always aware of these expenses. ¶ 75; and

CW13 finally explained that, in November, 2005, Freeland established a U.S. sales goal for December, 2005 of $17 million, which was extremely ambitious. CW13 explained, however, that, although FARO's U.S. sales force did respond to Freeland's request, it only achieved $15.1 million in sales for the month. As a result, according to CW13, FARO's claim that its U.S. sales exceeded expectations in 2005 (when, in

---

[6]CW stands for Confidential Witness.

fact, the sales force fell short of the ambitious goals set) and that sales commissions and bonuses were, therefore, somehow unexpected, simply was untrue.  ¶ 78.

The SAC alleges that the full $2.5 million in "higher than expected" selling expenses were attributable to expenses accrued in 2005, which FARO chose not to report until the corrective disclosure on January 19, 2006, which resulted in FARO's stock losing a quarter of its value in one day.  SAC at ¶¶ 182-184.  Viewed by the appropriate motion to dismiss standard, these allegations are specific enough and allege causation adequately enough to survive dismissal.

The FARO Defendants contend that "even if [they] had misstated the amount of FARO's first, second or third quarter 2005 selling expenses, the plaintiff's selling expense claim still would be non-actionable, because the plaintiff has utterly failed to plead facts from which an inference could be made that any such misstatement was made with scienter." (Doc. No. 83 at 22-23).  This is based on a contention that the SAC contains no allegations that these Defendants actually knew or were severely reckless in not knowing, when FARO reported its selling expenses for the first three quarters of 2005, that certain sales personnel would exceed their annual sales targets, resulting in higher selling expenses.  *Id.* at 21.  As the above allegations demonstrate, Plaintiff has plead that FARO and the Individual Defendants had access to and in fact tracked sales and selling expenses and that due to their knowledge, the selling expenses could not have been unexpected but were, in fact, intentionally and fraudulently under-reported in order to inflate reported and anticipated gross margins and profitability.  *See* SAC ¶ ¶ 5, 64,65, 66, 70, 71-75.  Coupled with the significant trading by Raab and Fraser that occurred prior to the corrective disclosure and the scienter allegations at ¶¶253-257, and absent any countervailing inference offered by these Defendants under *Tellabs,* scienter has been sufficiently pled as to this claim.

The Court finds that the selling expenses claim has been adequately stated against the FARO Defendants.

### The FCPA claim

The FARO Defendants contend that the FCPA claim cannot be sustained against the Individual Defendants as there are no allegations sufficient to find that these Defendants knew or were severely reckless in not knowing of the allegedly illegal activities in Asia. Plaintiff apparently agrees; noting that this claim is against the Company only (Doc. No. 90 at p. 26). With respect to the scienter of FARO itself, the issue is whether the Company can be found to have acted with scienter absent knowledge of the actual corporate officer making the alleged false statement to the market. In other words, can a court impute scienter to a corporation based on the knowledge of a corporate officer or employee even if that officer/employee is not the one making the false statement? The courts are divided on this issue.

The FARO Defendants contend that courts "refuse to impute scienter to a corporation based on the wrongful acts of corporate employees who did not make any allegedly false statements to the market," citing *In re InVision Technologies, Inc. Securities Litigation,* 2006 WL 538752 (N.D. Calif. January 24, 2006), *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.,* 365 F.3d 353,366 (5th Cir. 2004) and *In re Apple Computer, Inc.,* 127 Fed.Appx. 296, 303 (9th Cir. 2005) (all rejecting the so-called collective knowledge doctrine). In other cases, however, courts did indeed impute scienter based on the actions of corporate employees. *See In re WorldCom Sec. Litig.*, 352 F.Supp.2d 472, 497 (S.D. N.Y. 2005); *In re Marsh v. McClellan Companies, Inc. Securities Litigation,* 2006 WL 2057194 (S.D. N.Y. July 20, 2006), but see *In re Bio-Technology General Corp.* 2006 WL 3068553 (D. N.J. October 26, 2006) citing *In re Dynex Capital, Inc. Sec. Litig.*, Civ. No. 05-1897, 2006 WL

1517580 (S.D. N.Y. June 2, 2006 ) (recognizing split of authority between Second Circuit and other courts regarding whether "collective scienter" is a viable theory and granting right to file an interlocutory appeal as to that issue due to conflicting authority within the Second Circuit). As noted by a recent commentator, the issue is far from settled. *See* Kevin M. O'Riordan,"Clear Support Or Cause For Suspicion? A Critique of Collective Scienter in Securities Litigation," 91 MINN. L. REV. 1596 (2007). Neither side has cited any controlling precedent and the Court's independent research yields none.[7] As such, the Court addresses the issue *de novo.*

On the one hand, it is true that a corporate defendant's scienter is necessarily derived from its employees, as the *Marsh* court notes. Nonetheless, as recognized in general contract and agency principles, not every employee's voice is that of the corporation. There is a marked distinction between, for example, the mail room clerk and the CEO with respect to the legal authority to act for or bind the corporation through actual or apparent agency. Just as one would not expect the knowledge of the mail room clerk to be imputed to the board of directors for purposes of a general fraud action, the Court sees no reason for distinction in the setting of alleged securities fraud. Therefore, in order to state an actionable claim of institutional fraud, this Court holds that scienter must be found as to either the employee making the alleged false statement to the market or as to any other high level employee, consistent with generally accepted agency principles. *See, e.g., Hill v. Tribune Co.*, 2006 WL 2861016, at *12 (N.D. Ill. Sept. 29, 2006) (holding that a corporation's scienter is limited to senior officers or directors or lower level employees responsible for the misrepresentation); *In re Sonus Networks, Inc. Sec. Litig.*, 2006 WL 1308165, at *22 (D. Mass. May 10, 2006) (pleading the scienter of the corporate controller satisfied the strong inference standard).

---

[7]The Eleventh Circuit found it unnecessary to address the related "group pleading doctrine" in *Phillips v. Scientific-Atlanta, Inc.,* 374 F.3d 1015 (11th Cir. 2004).

Applied here, Plaintiff has alleged that Oscar Meza, a Vice-President of the Company and a senior member of management, was directly involved in and had knowledge of the allegedly illegal conduct at issue and, in fact, had been terminated as a result.  SAC ¶¶ 83-84, 86, 259.  Additionally, CW 17 is also alleged to be a "a member of FARO's senior management" with knowledge of "the use of bribes to generate sales in Asia." ¶ 86.  It is suggested that more witnesses, including FARO's ex-company manager for South Korea, have additional information.  *Id.*  The Company's annual report, belatedly filed on June 29, 2006, acknowledged the improper payments (which totaled over half a million dollars, over the course of 2004, 2005 and a portion of 2006) and notified the public that it had "terminated certain personnel in the Asia-Pacific Region and re-assigned the duties of other personnel in both the . . . Region and the United States as a result of the internal investigation . . ." ¶ 194.  It is thus clear that the wrongdoing alleged was not a single act of a low-level employee, but rather, an ongoing method of doing business by FARO.  This is sufficient to plead corporate scienter.

The Court finds that the FCPA claim has been adequately stated.

### *The Internal Controls Claim*

The final claim alleged against the FARO Defendants is the alleged falsity of FARO's oft-repeated claim that it had, at all relevant times, adequate internal controls in place to ensure reliability of its financial reporting statements.  *See* SAC ¶87.  The FARO Defendants assert that this claim must fail in that, at best, Plaintiff alleges mismanagement, not misrepresentation and, alternatively, due to an absence of scienter.

Initially, the Court disagrees with these Defendants characterization of the previous Report as  finding the prior allegations (reasserted here) to be "inactionable."  This Court did *not* find the claims in the Amended Complaint inactionable; rather, it could not *find* the *claims*.  (Doc. No. 70 -

"Plaintiff has the burden of pleading its claims with particularity, and the structure of the CAC does not allow for the claim by claim, defendant by defendant analysis called for in the case law. As such, Plaintiff must be made to re-plead.") Plaintiff has made great strides in clarifying the claims in the SAC.

As for the claim that the FARO Defendants falsely stated the status of the Company's system of internal controls, the FARO Defendants contend that fecklessness is not recklessness and that the numerous allegations of ineptitude amount to no more than mismanagement, at best. The Court finds much more than mere allegations of mismanagement here: indeed, the Individual Defendants are not alleged to be simply poor managers – they are alleged to be dishonest ones.

While mismanagement *alone* does not give rise to a claim for actionable securities fraud, the SAC alleges not only mismanagement, but deception, misrepresentation and nondisclosure of material matters. In addition to the inventory issues, the selling expense under reporting, and the illegal bribes (all of which are alleged to support the falsity of the represented adequacy of the internal controls system), the SAC details continued reliance on a known to be seriously deficient ERP system, embezzlement by the Comptroller (which was not disclosed to the public), and allegations of well over a dozen confidential witnesses as to various matters from understaffing to inadequate reporting systems. The SAC alleges a knowing fraud, designed to artificially inflate the stock value so that Raab and Fraser could cash out. Viewed as a whole, the SAC states (with supporting factual allegations) that the Individual Defendants and the Company itself knowingly or recklessly attested to the adequacy of the internal controls system, when they knew that the system was, in fact, seriously inadequate. This is sufficient at this stage.

*Scienter*

As for scienter, the FARO Defendants assert that scienter is not pled in that:

1) Sarbanes-Oxley Certifications are only probative of scienter "if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." (Doc. No. 83, citing *Garfield,* supra, 466 3d at 1266.)

2) The allegations of massive insider trading by Raab and Fraser occurred almost six months prior to the first disclosure (November 3, 2005) and the broad temporal distance between the sale and the disclosure defeats any inference of scienter, noting that stock sales are "insufficient alone to create a strong inference of scienter," *citing In re Miller Industries, Inc. Securities Litigation,* 120 F. Supp. 2d 1371, 1383 (N.D. Ga. 2000).

3) Allegations that each individual had "full access to the financial books and records" are insufficient in that "a pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company," *quoting Abrams v. Baker Hughes, Inc.,* 292 F.3d 424 at 432 (5th Cir. 2002).

None of these arguments is persuasive.  The SAC *does* allege that the signing of the certifications was reckless in view of their known falsity.  Moreover, while stock sales "alone" may be insufficient to show scienter, Plaintiff alleges much more than a mere stock sale.  Plaintiff pleads "massive" insider trading along with specific allegations that Raab and Fraser knew of the true nature of the Company's internal controls.  As such, Plaintiff does not rely on a mere "inference" that defendants "must have been aware."  Plaintiff pleads they *knew.* ¶¶ 253, 255, and 257.[8]

Most importantly, as directed by the Supreme Court in *Tellabs,* this Court must approach the scienter issue by 1) accepting all factual allegations as true; 2) holistically evaluating the complaint

---

[8]With respect to Defendant Smith, the SAC alleges that she made false statements and that she knew about the true nature of the Company's internal controls.  *See*  ¶¶257, 112, 186.

in its entirety to determine whether *all* of the facts give rise to a strong inference of scienter, and 3) taking into account plausible opposing inferences of nonfraudulent intent.  In spite of a direct invitation to do so, the FARO Defendants do not provide the Court with a "plausible opposing inference" sufficient to counter the significant  weight of the scienter inference that arises from the totality of the allegations.  In fact, the absence of any suggested counter inference strengthens  the contention that there can be but one conclusion drawn from the facts, as pled.  A complaint will survive only if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs* at *12-13.  As no opposing inference is evident, the inference of scienter is cogent, indeed.

It is therefore **respectfully recommended** that the FARO Defendants motion to dismiss be **DENIED.**

### The Claims Against GT

By contrast, the claims against the auditor are no more certain than when first pled.  GT made two public statements with respect to FARO during the Class Period: 1) an unqualified independent auditor's opinion on FARO s financial statements for the year ended December 31, 2004 ("the Audit Opinion"), which was incorporated in FARO s March 16, 2005 Form 10-K public filing; (SAC at ¶ 164); and 2) the opinion as to management's assessment of FARO' s internal controls as of December 31, 2004, as required by Section 404 of the Sarbanes-Oxley Act of 2002 (¶ 163).  Plaintiff contends that GT is liable for fraud in that it acted with severe recklessness in making the certifications because GT "knew or reasonably should have known, of pervasive problems with FARO's inventory control and financial reporting systems" (Doc. No. 90 at 39).  The Court, looking at the entire complaint, finds that Plaintiff has failed to state a cause of action against the auditor as a matter of law.

The Court discussed the case against the auditor in prior Report, and concluded that the "red flags" previously pled by Plaintiff (and re-alleged here, without significant change) were insufficient to establish severe recklessness.  As with the prior complaint, there are no allegations here that GT was an active participant in any fraud alleged to have been conducted by the FARO Defendants, nor is there any allegation that GT was tipped off to the wrongdoing.  The SAC does not allege that GT prepared the press releases at issue, nor are there allegations that GT ran the Company or participated in management decisions, sufficient to impute FARO's alleged wrongdoing to GT.  As argued by Plaintiff, however, "the SAC now pleads direct knowledge by GT of internal control deficiencies which, when coupled with the previously pled "red flags," establishes severe recklessness with respect to GT's challenged statements." (Doc. No. 90, n. 40).

Plaintiff alleges and concludes that GT "knew and was advised about the true nature of nature of the Company's internal controls and the severe deficiencies in those controls from a financial and operational perspective before issuing the operative statements" (SAC, ¶ 261(a)).  Factual support for this allegation is said to be contained in ¶ 101 (which alleges that CW1 "relayed the problems encountered with the Navison migration in October/November 2004" to GT auditors) and ¶106 (alleging that in February 2005, CW1 had "specific conversations with auditors" and the fact that "the problems experienced in Pennsylvania with Navison since October/November 2004 were now occurring throughout the Company" and the system was unable to accurately track and value inventory).  Plaintiff contends that this amounts to direct knowledge that the internal controls were inadequate.

As pointed out by GT, the Audit Opinion and the Section 404 opinion both speak to the state of the Company's internal controls as of December 31, 2004.  Thus, the issue -- the *only* issue -- is

-20-

whether Plaintiff has pled sufficiently that these statements were knowingly (with scienter) false when made. The SAC implies, at best, that GT was informed about "problems" with the new system in one location (Pennsylvania) in October/November 2004.[9]  The second conversation did not occur until February 2005, *after* the applicable period of time at issue in the alleged misrepresentations. The conversation, as it is described in the complaint, does not support an inference that the opinions rendered regarding the Company were fraudulent when made. Knowledge of "problems" with a new system shortly after it has been implemented is not akin to knowledge that FARO is carrying obsolete inventory or deliberately overvaluing its inventory, or any other fraud, for that matter. While the new allegations may, at best, argue a case for negligence or accountant malpractice in failing to investigate further, this does not equate to actual knowledge of allegedly fraudulent activity. There is simply no factual support alleged for a conclusion that GT had "direct knowledge" of inadequate internal controls (and thus, the falsity of its certifications) at the time it made its statements.

Nor does the Court find adequate support for an allegation that GT was severely reckless in not knowing of the internal control situation.[10]  The SAC reflects that, in the same October/November 2004 time period, GT was conducting a partial physical audit of inventory, as part of its 404 duties ¶ 102. To the extent Plaintiff contends this audit was not sufficient and should have been a complete physical inventory (which apparently would have revealed the inventory issues), such is, at best, an allegation of negligence. As this Court previously noted in the prior Report, the standard for pleading a claim against an auditor is particularly high:

---

[9]The new ERP system was not fully implemented until August 2005, well after the dates at issue.

[10]As the Court noted in prior Report, Plaintiff does not allege that as of one month after installation, GT could have known that the ERP system would eventually prove to be inadequate and unfixable.

As noted above, in this circuit, it is not enough to establish that an auditor merely erred or was negligent in failing to discover information; rather, in order to plead a securities fraud claim, Plaintiff must offer specific factual allegations that are sufficient to support the "strong inference that the audit was so deficient that it amounted to no audit at all." *Sunterra,* 199 F. Supp. 2d at 1337.

(Doc. No. 70 at 32). Such is lacking here.

As with the prior complaint, Plaintiff has again alleged various violations of GAAP [11] and GAAS [12] and the Court accepts those allegations as true, for present purposes. Nonetheless, GAAP and GAAS violations alone are not enough to establish a strong inference of scienter on the part of the independent auditor even if the auditor is grossly negligent in carrying out its responsibilities. *In re Sunterra,* 199 F.Supp.2d at 1333. Nor is the Court persuaded by the re-assertion of the parade of red flags previously found wanting. SAC at ¶ 214. The Court rejects the "red flags" for the same reasons stated in the prior Report. To the extent the SAC asserts an additional alleged "red flag," as indicated below, the Court is still not persuaded.

Plaintiff asserts that as an additional "red flag" GT should have known of the fraud because it knew of "the fact that FARO conducted significant operations across international borders, including in Asia, where differing business environments and cultures exist." SAC ¶ 214(d). The Court does not agree with the implicit contention made by Plaintiff that different cultures present a *prima facie* risk factor for fraud because "corruption is a tenacious reality in many global markets, where foreign officials continue to solicit bribes routinely from U.S. Companies and their representatives." (Doc. No. 90 at 51- internal citation omitted). This suit is not about the *solicitation* of bribes by corrupt foreign officials, it is about the alleged *payment* (and cover-up) of same by

---

[11] Generally Accepted Accounting Principles.

[12] Generally Accepted Auditing Standards.

employees of a United States corporation.  The mere fact that a corporation is doing business outside the United States does not mean an auditor should presume that business is necessarily being conducted fraudulently.  Even if foreign business dealings create some free floating anxiety that wrong doing could ensue, vague concerns are no substitute for the strong inference of scienter required for pleading a claim.

Applying the *Tellabs* standard, viewed holistically, the SAC does not raise a strong inference of scienter that is at least as compelling as the opposing inference of non-fraudulent intent offered by GT.  As Plaintiff has been given two opportunities to state a claim against the auditor and has failed to do so, it is **respectfully recommended** that the motion to dismiss be granted, with prejudice.

### CONCLUSION

It is **respectfully recommended** that the motion to dismiss brought by the FARO Defendants be **denied,** and the Defendants be made to answer the SAC within 11 days of any Order adopting this Report.  It is also **respectfully recommended** that the motion to dismiss brought by GT should be **granted, with prejudice.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on August 7 , 2007.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy